NITA KLUNDER (Mass. Bar No. 689304)
Email: KlunderNi@sec.gov
KATHLEEN SHIELDS (Mass. Bar No. 637438)
Email: ShieldsKa@sec.gov
ERIC FORNI (Mass. Bar. No. 669685)
Email: ForniE@sec.gov
Securities and Exchange Commission
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8822 (Klunder Direct)
Facsimile: (617) 573-4590

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>FREDERICK BAUMAN,<br><br>Defendant. | Case No. 2:21-cv-1651<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, United States Securities and Exchange Commission (the "SEC") alleges as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77t(b), 77t(d)(1) & 77v(a).

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the

transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because at all relevant times, Defendant Bauman maintained a law office in this district and also resides in this district.

## SUMMARY

4. This is a securities law enforcement action. Bauman, a licensed attorney who specialized in securities law and securities transactions, was a necessary participant and substantial factor in sales of securities of public companies under circumstances where the sales were legally required to be registered with the SEC but they were not. This complaint focuses on his actions with respect to the stock of four public companies between 2016 and 2019. As an attorney, Bauman authored at least a dozen attorney opinion letters stating his view that securities owned by certain shareholders of those four public companies could be freely traded to investors in the public markets.  These opinion letters were misleading in certain ways.  In fact, the securities owned by these shareholders were not freely tradeable and Bauman's opinion letters facilitated the unregistered sales of securities by these shareholders.

5. A company is considered "public" when its securities trade on established securities markets and the company discloses certain business and financial information regularly to the investing public.

6. Bauman's clients, on whose behalf he wrote the opinion letters, were actually part of groups that controlled the companies whose stock they owned ("Control Groups"), and because of this they were "affiliates" of the companies under the securities laws enforced by the SEC. Bauman's misleading opinion letters enabled his Control Group clients illegally to sell their shares in violation of federal securities laws that: (1) require such shares to be issued pursuant to a valid securities

registration statement; (2) require disclosure of truthful information about ownership and control of companies that sell stock to the public; and (3) restrict the amounts of stock that may be sold by companies' affiliates such as the Control Groups.

7. Bauman's opinion letters falsely represented that the shareholders on whose behalf he was writing were not "affiliates" of the companies whose stock they owned. Bauman sent those letters to transfer agents – entities that record the ownership and transfer of securities, and thus routinely track whether particular securities are subject to resale restrictions. Bauman knew that the purpose of his letters was for the transfer agents to treat the stock as unrestricted, and record transfers on that basis. But for Bauman's opinion letters, the transfer agent would not have issued the stock without a restrictive legend. Bauman's letters thereby facilitated his clients' illegal stock sales.

8. As detailed further below, Bauman's opinion letters facilitated the dumping of at least the securities of EnviroTechnologies International, Inc. ("EnviroTechnologies"; Ticker: ETII), Cyberfort Software, Inc. ("Cyberfort"; Ticker: CYBF), Blake Insomnia Therapeutics, Inc. ("Blake"; Ticker: BKIT), and Sandy Steele Unlimited Inc. ("Sandy Steele"; Ticker: SSTU).

9. The Control Groups' sales of these four companies' stock were unregistered and violated Section 5 of the Securities Act.

10. As a result of the conduct alleged herein, Bauman violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act.

11. The Commission seeks a permanent injunction against Bauman, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of Bauman's ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)]; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)]; an order

barring Bauman from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)]; an injunction restraining Bauman from providing legal services in connection with the offer or sale of certain securities; and such other relief as the Court may deem appropriate.

## DEFENDANT

12. Frederick Bauman, age 69, resides in Las Vegas, Nevada. Bauman is an attorney and solo practitioner at Bauman & Associates Law Firm, which is based in Las Vegas, Nevada. Bauman is admitted to practice law in Arizona, California, Nevada, New Jersey, New York, and Texas.

## THE ALLEGATIONS

A.  **Terminology and Background**

13. Persons who control companies which have stock that is sold to the public are subject to a variety of legal and regulatory requirements. Such persons are called "affiliates" and the public companies are called "issuers." An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer. "Control" means the power to direct management and policies of the company in question. Affiliates include officers, directors and controlling shareholders, as well as any person who is under "common control" with, or has common control of, an issuer. As used herein, the term "Control Group" means a group that collectively is an "affiliate" of an issuer.

14. "Restricted stock" includes stock of a company whose shares are publicly traded (also known as an "issuer") that has been acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission. In addition, stock held by an issuer or affiliate of an issuer is restricted stock. Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).

A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management. A registration statement is also required to disclose any person or group who is the beneficial owner of more than 5% of the company's securities.

15. "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement. Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement. Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. Thus, when an affiliate buys publicly-traded or otherwise unrestricted shares in a company s/he controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration. Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

16. The term "float," as used herein, refers to an issuer's purportedly unrestricted stock that is available for trading.

17. A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership. Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock. Transfer agents routinely keep track of whether shares are restricted from resale.

18. Over-the-Counter ("OTC") Markets, Inc. is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange). Public companies that do not have an obligation to file reports with the Commission

may choose to file public reports (such as quarterly and annual statements) on the OTC Markets website for investors to review and consider when making investment decisions.

19. "Penny Stock," as used herein, generally refers to a security issued by a very small company that trades at less than $5 per share.

**B.    Rule 144 Safe Harbor**

20. The Securities Act requires that if any person sells a non-exempt security to any other person, the sale must be registered with the Commission absent an applicable exemption.

21. Section 4(a)(1) of the Securities Act provides one such exemption for a transaction "by any person other than an issuer, underwriter, or dealer."

22. An "underwriter," as defined in Section 2(a)(11) of the Securities Act, is any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates, or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

23. Rule 144 of the Securities Act creates a safe harbor from the Section 2(a)(11) definition of "underwriter." A person satisfying the applicable conditions of the Rule 144 safe harbor is deemed not to be engaged in a distribution of the securities and therefore not an "underwriter" of the securities for purposes of Section 2(a)(11). Therefore, such a person is deemed not to be an underwriter when determining whether a sale is eligible for the Section 4(a)(1) exemption.

24. If a person is not deemed an "affiliate," then such person, consistent with the specifications of Rule 144(b)(1)(i), may sell unrestricted securities as that person is not deemed an "underwriter."

25. Rule 144 sets strict limitations on the quantity of shares that affiliates may sell in a given time period.

**C.  Bauman Was a Necessary Participant and a Substantial Factor in the Distribution of Unregistered Stock**

26. Bauman wrote opinion letters for at least two Control Groups that allowed those Control Groups to sell stock illegally.

27. An individual (identified herein as "Person A") and his father (identified herein as "Person B") controlled EnviroTechnologies, Cyberfort, and Blake and owned significant portions of each company's stock.

28. To conceal their control of the stock of EnviroTechnologies, Cyberfort, and Blake, Person A and Person B divided the ownership of these companies' shares between a group of purportedly distinct corporate shareholders. These corporate shareholders were actually nominees for Person A and Person B. That means the corporate shareholders were either themselves owned or controlled by Person A and Person B or had agreed to take direction from Person A and Person B in regard to these shares. Breaking up nominal ownership of the shares among those corporate entities assisted Person A and Person B in evading the limitations on unregistered sales by affiliates.

29. Likewise, a second Control Group controlled Sandy Steele and broke up nominal ownership of the group's shares by holding those shares in the names of various entities that they controlled, in an effort to evade the limitations on unregistered sales by affiliates.

30. Bauman authored opinion letters, which represented that the various nominee shareholders were not affiliates of the issuers.

31. Absent such opinion letters, the Control Groups' sales in quantities exceeding 1% of the outstanding shares of the same class being sold during any three-month period violated the securities laws.

32. As shown below, the Control Groups for whom Bauman authored opinion letters collectively controlled almost all of the shares available for public trading for the issuers in question. The Control Groups used Bauman's opinion letters

so that transfer agents would treat the shares of stock as unrestricted, allowing them to sell shares in excess of the volume restrictions to the public without a registration statement in violation of Section 5.

| Issuer | Dates of Bauman Opinion Letters | Number of Shares Covered by Bauman Opinion Letter | Percent of Float | Dates of Unregistered Sales | Number of Shares Sold without Required Registration Statement |
|---|---|---|---|---|---|
| ETII | 10/20/16-4/27/17 | 50,000,000 | Over 99% | February through June 2017 | 3,900,000 |
| BKIT | 3/19/19-6/10/19 | 3,818,813 | 99.7 | May through July 2019 | 3,125,983 |
| CYBF | 6/6/18-8/27/18 | 3,750,000 | Over 99% | June through December 2018 | 1,270,273 |
| SSTU | 6/29/2019 | 12,000,000 | 80.89% | October 2019 through April 2020 | 9,581,612 |

### D. Bauman Lacked a Reasonable Basis for Representing that the Shareholders Were Not Affiliates

33. In each instance where Bauman's opinion letters violated Section 5, he lacked a reasonable basis for representing that the shareholders were not affiliates.

34. Since 2009, Bauman has authored hundreds of opinion letters to transfer agents on behalf of shareholders of various penny stock companies indicating that various shareholders were entitled to hold and sell certain shares free of a restrictive legend. During that time Bauman typically wrote three such opinion letters per business day, and endeavored to send them to his clients within twenty-four hours of a client's request. In some instances, he completed opinion letters within hours, if not minutes, of a client's request. This left little, if any, time to conduct diligence.

35. Since at least 2015, Bauman has authored dozens of opinion letters at the request of one individual, Person A. Person A engaged Bauman to write opinion letters on behalf of supposedly independent shareholder entities who sought to convince transfer agents to treat stock they held in various issuers as unrestricted.

36. In several instances where Person A asked Bauman to write opinion letters on behalf of shareholders, the issuers involved had recently undergone changes in corporate structure and stock ownership structure. These types of changes are common features of stock manipulation schemes and information regarding these changes was readily available to Bauman through public sources at the time.

37. When Person A emailed Bauman to request opinion letters on behalf of various shareholders, Person A was Bauman's sole point of contact. With regard to opinion letters ostensibly written on behalf of the named shareholders, Bauman never spoke to anyone at the shareholder entities. Nor did he speak to the issuer to understand what (if any) relationship the issuer had with Person A, or the purported shareholders.

38. Bauman was told by Person A that Person A was acting on behalf of a "family office,"[1] and that the named shareholder entities were clients of Person A and Person B. Yet Bauman never undertook to understand the scope of that client relationship. In at least one instance, Bauman was informed that Person A and his family owned one of the shareholder entities, notwithstanding the fact that neither Person A nor Person B's names appeared on any of the paperwork Person A provided to Bauman for that entity. Still, Bauman did not ask who owned any of the other shareholder entities on whose behalf Person A sought opinion letters.

39. Person A, or his mother (identified herein as "Person C"), paid for the opinion letters Bauman wrote for the shareholder entities. Bauman nonetheless assumed that the shareholder entities were neither controlled by, nor coordinating with, Person A or Person B. Bauman never asked why Person A or Person C made these payments.

40. In addition to making payments on behalf of shareholders, Person A and Person C also paid Bauman for his services on behalf of the companies issuing stock

---

[1] A "family office" generally refers to an entity that handles investment and wealth management for a wealthy family.

to the purported shareholder "clients" of Person A and Person B. For example, Person A engaged Bauman to write Letters With Respect to Adequate Current Information ("Current Information Letter") for several issuers and to send those letters to OTC Markets. Current Information Letters are written to certify that an issuer has made adequate public disclosure of current information, without which OTC may place a stop or yield sign on the issuer's stock, which may affect its trading or desirability to investors.

41. In one instance in 2016 where Person A was paying Bauman for an issuer's Current Information Letter, Person A emailed Bauman that "[t]he company reached out to you without ever asking my permission[.]" Notwithstanding that indicia of Person A's control over the issuer (that the company apparently needed Person A's "permission"), Bauman continued writing three opinion letters for shareholders, at Person A's request, to the transfer agent indicating that over 150 million shares of that issuer could be held and sold free of a restrictive legend. He did not ask any questions about Person A's role with regard to the issuer or the shareholders.

42. When requesting opinion letters on behalf of shareholders, Person A typically emailed underlying documentation to Bauman which included: (1) a promissory note; (2) an agreement conveying the stock from the original noteholder to the shareholder; (3) a notice of conversion by the shareholder; and (4) the issuer's board consent relating to the conversion.

43. Person A usually sent Bauman requests for multiple shareholders at or around the same time where the documentation reflected that the shareholders had acquired equal or nearly equal shares of the same promissory note at or around the same time, and converted their stock at or around the same time. Nonetheless, Bauman never inquired as to whether the shareholders were acting in coordination.

44. Rather, before writing an opinion letter, Bauman generally only confirmed that the issuer was not a shell company and that the shares complied with

the requisite holding period.

45. As to whether shareholders were affiliates of the issuer, a central issue on which he was opining in his attorney opinion letters, Bauman knew that the relevant inquiry regarding control encompassed "the power to direct the management and policies of the [issuer]… through the ownership of voting securities, by contract, or otherwise."

46. Yet, Bauman took limited steps to determine who was actually in control of the issuer or the shareholder. He occasionally looked at the names of officers and directors of the issuer to see if their surnames matched the signatory of the shareholder (to the extent the signature was legible), and otherwise assessed whether the shareholder held more than ten percent of the issuer's total outstanding stock (restricted and unrestricted combined).

47. Bauman knew that holding a large percentage of the float could be a "red flag," yet he did nothing to determine the percentage of the float (or unrestricted stock) his opinion letters covered.

48. The letters Bauman wrote at Person A's request often covered nearly the entire float of the particular issuer.

49. Likewise, with regard to Sandy Steele, Bauman was contacted by a single individual to write four opinion letters for four shareholders ("the Four Shareholders").

50. On or about June 29, 2019, Bauman issued four opinion letters directing Sandy Steele's transfer agent to issue certificates for 3,000,000 Sandy Steele shares to each of the Four Shareholders without restrictive legends. Bauman did not speak with anyone at Sandy Steel or the Four Shareholders before issuing his four opinion letters.

51. On or about June 29, 2019, one of the members of the Sandy Steele Control Group paid Bauman for writing the four opinion letters for each of the Four Shareholders.

## FIRST CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

52. The SEC realleges and incorporates by reference paragraphs 1 through 51 above.

53. Shares of EnviroTechnologies, Blake, Cyberfort, and Sandy Steele are securities under Section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

54. By engaging in the conduct described above, Bauman, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities.

55. By engaging in the conduct described above, Bauman has violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Bauman committed the alleged violations.

### II.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Bauman and his agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each

of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), 77e(c)].

### III.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining Bauman from directly or indirectly providing, or receiving compensation from the provision of, professional legal services to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(a)(1) of the Securities Act, predicated on Securities Act Rule 144, or any other exemption from the registration provisions of the Securities Act, including, without limitation, participation in the preparation or issuance of any opinion letter relating to such offering or sale.

### IV.

Enter an order barring Bauman from participating in the offer or sale of a penny stock, as that term is defined in Section 20(g) of the Securities Act [15 U.S.C. §77t(g)].

### V.

Order Bauman to pay a civil penalty under Section 20(d) of the Securities Act [15 U.S.C. §77t(d)].

### VI.

Order Bauman to disgorge, with prejudgment interest, all ill-gotten gains he obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(7) of the Exchange Act [15 U.S.C. §78u(d)(7)].

### VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 8, 2021

/s/ Nita K. Klunder
NITA K. KLUNDER (Mass. Bar No. 689304)
Email: KlunderNi@sec.gov
KATHLEEN SHIELDS (Mass. Bar No. 637438)
Email: ShieldsKa@sec.gov
ERIC FORNI (Mass. Bar. No. 669685)
Email: ForniE@sec.gov
Securities and Exchange Commission
33 Arch Street
Boston, MA 02110
(617) 573-8822 (Klunder Direct)
Facsimile: (617) 573-4590

Attorneys for Plaintiff
Securities and Exchange Commission